IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| MELVIN BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | )    Case No: 14-00140 (TSC) |
| | ) |
| | ) |
| SANDRA HILL, et al., | ) |
| | ) |
| Defendants. | ) |

_____

## FOURTH AMENDED COMPLAINT

### JURISDICTION

1.      This case raises issues under the United States Constitution and the common law of the District of Columbia. Thus, the issues raise federal question, or subject matter jurisdiction, under 28 U.S.C. Sect 1331, 42 U.S.C. Sect. 1983 and supplemental jurisdiction under 28 U.S.C. Sect 1367.

### PARTIES

2.      Plaintiff Melvin Brown is a 71 year old African-American male and for all relevant time periods resided in the District of Columbia.

3.      Defendant Amelia Villaruz, MD, was an employee of the District of Columbia government, practicing medicine in the District of Columbia for all relevant time periods. Upon information and belief, she now resides in Bowie, MD. Dr. Villauz is being sued in her official and individual capacities.

4.      Defendant William Peters was and, upon information and belief, remains an employee of the District of Columbia Department of Behavioral Health and was employed there for the relevant time period. Mr. Peters is being sued in his official and individual capacities.

5.      Defendant Isha Edwards was and, upon information and belief, remains an employee of the District of Columbia Department of Behavioral Health and was employed there for the relevant time period. Mr. Edwards is being sued in his official and individual capacities.

6.      Defendant David Walker was and remains an employee of the District of Columbia Department of Behavioral Health and is being sued in his official and individual capacities.

7.      Defendant John Adams is the President of So Other Might Eat ("SOME"), a community-based organization operating in the District of Columbia with an address of 70 O Street, NW Washington D.C. 20001.

8.      Defendant Richard Gerlach is the Executive Director of SOME, a community-based organization operating in the District of Columbia with an address of 70 O Street, NW Washington, D.C. 20001.

9.      Defendant Ann Chauvin is the Chief Medical Officer of SOME, a community based organization with an address of 70 O Street, NW Washington D.C. 20001.

10.      Defendant Belinda Sealy is the Director of Adult Housing of SOME, a community-based organization located at 1876 4th Street, NE Washington, DC 20002.

11.      Defendant Susan Bond CAO of Shalom House, operated by SOME, a community-based organization located at 1876 4th Street, NE, Washington D.C. 20002.

12. Defendant Lawrence Parrot, Night Manager of Shalom House, operated by SOME a community-based organization located at 1876 4th Street, NW Washington D.C. 20002.

2

13. Defendant Francis Brown-McCall, 1835 3rd Street, NW Washington D.C. 20002.

14.  Defendant Sandra Hill, 60 O Street, NW Washington, D.C. 20001.

15.  Defendant Margaret Simmons, 60 O Street, NW Washington, D.C. 20001.

16.   Defendant Laura Nichols was an employee of Green Door, Inc. a community based organization located at 1221 Taylor Street, NW Washington, D.C. 20011.

17.   Defendant Sarah Hochbaum is a former employee of Green Door, Inc., a community-based organization that was located at 1221 Taylor Street, NW, Washington D.C. 20011.

18.  Defendant Dana Vanzant is a former employee of Green Door, Inc., a community-based organization located at 1221 Taylor Street, NW, Washington, D.C. 20011.

19.  Green Door, Inc. was a community-based organization located at 1221 Taylor Street, NW, Washington, D.C. 20011

## VENUE

20.   Because Plaintiff is a resident of the District of Columbia, and all events occurred in the District of Columbia by entities that were then operating in the District of Columbia, venue is proper.  28 U.S.C. Sect. 1391 *et seq.*

## ALLEGATIONS

21. On July 3, 2014, Plaintiff filed suit in the D.C. Superior Court to obtain his records pertaining to his stay at SOME and subsequent confinement at CPEP and the Psychiatric Institute of Washington. On 8/3/2014, Plaintiff obtained the records that were the subject of his D.C. Superior Court lawsuit, providing Plaintiff the information and notice of these causes of action. On December 11, 2013, Plaintiff initiated this action in the U.S. District Court for D.C.

3

22.  The District of Columbia Department of Mental Health ("DMH"), now the Department of Behavioral Health, is charged with the care of District residents who suffer from mental illness. As a part of its operations, DMH contracts with various core service providers, including Psychiatric Institute of Washington, So Others Might Eat and Green Door. DMH also operates Comprehensive Psychiatric Emergency Program ("CPEP"), a crisis care facility. Persons suffering from acute mental crisis who are subject to involuntary commitment are first taken to CPEP for a forty-eight (48) hour observation. *See*  D.C. Official Code Sect. 21-521. Under D.C. Official Code 21-521, a person may be taken into custody based on probable cause that the person suffers from a mental illness and because of this mental illness he/she poses an immediate risk of harm to himself or others and that hospitalization is the least restrictive means available to address these issues. *Id.* Upon taking a person into custody, the arresting officer shall file an application that "…reveal[s] the circumstances under which the person was taken into custody and the reasons therefor." *Id.* In the District of Columbia this application is named an "FD 12."

23.  Once in custody, persons in crisis are transported to CPEP for a 48 hour observation. If a psychiatrist or administrator of the facility petitions the D.C. Superior Court for hospitalization within the 48 hour period, a person may be detained a further 7 days from the time the order is entered by the Court. This petition must set forth and certify that the person is mentally ill; that because of this illness this person poses an immediate risk of harm to himself or others; and that hospitalization is the least restrictive means available. D.C. Official Code 21523. Within 24 hours of receipt of this petition, the D.C. Superior Court shall: a) order the person's continued detention, or 2) order the persons immediate release. In making this determination, the D.C. Superior Court shall consider the written reports of the petitioning agent or physician, the

certificate of the examining psychiatrist or qualified psychologist, and any other information

deemed relevant. D.C. Official Code 21-524. If a detained person requests a hearing, The D.C.

Superior Court shall grant a hearing within 24 hours of receipt of the request of the detained

person. *Id.*

24.  There are two short term mental health crisis centers in the District of Columbia.

These are Jordan House, a facility operated by So Others Might Eat, and Crossing Place. The

total bed space for these facilities is fifteen (15) beds. These facilities offer a less restrictive

alternative to persons deemed to be in a mental health crisis and are intended to prevent

psychiatric hospitalizations by sheltering and stabilizing those in crisis. A person is deemed in

crisis if they are an imminent risk of being hospitalized. It is the practice of DMH to either order

the hospitalization of persons in mental crisis or release them to the community. Despite the

existence of alternative crisis programs offered at Jordan House and Crossing Place that are less

restrictive than hospitalization, it was not a practice of DMH to consider or order a less

restrictive alternative.

25. SOME and Green Door were contractors with the District of Columbia in which

SOME assumed the performance of state functions. Indeed, the provision of housing and mental

health services for the homeless has been a function traditionally reserved for the state. Under

D.C. Code Sect. 7-1131.14, the Department of Mental Health (now the Department of

Behavioral Health) is required to establish "standards for the operation of mental health services"

in the District of Columbia. All providers who contract with the District are subject to these

requirements. Thus, through regulation and statute, the District of Columbia has been

traditionally charged with the care of the homeless and mentally ill.

26. Practitioners who assist persons served by DMH observed that rarely if ever are persons sent from CPEP to the less restrictive crisis centers in the District of Columbia. These facilities offer a less restrictive alternative to hospitalization and total 15 beds to service the entire District of Columbia. Data collected from a DMH meeting in April of 2011 indicate:

> 1) The Hospital census had decreased 25% over the last two years from 375 to 280 (on the civil side the decrease was 30%); 2) Acute care utilization for the first five months was about 73 involuntary care admissions to a bed with the breakdown as follows: three to Saint Elizabethss; seven to the Washington Hospital Center; 30 at Providence Hospital, and 35 at the United Medical Center

None of the involuntary admissions were admitted to a bed at a less restrictive mental health crisis center.

And while recognized as a useful component of a mental health system, these crisis units remain under-utilized. In a Court Monitor Report from 2010, in FY 2009 the record for CPEP admissions to these less restrictive crisis centers comprised 21%, or 84, of the total 394 admissions to these less restrictive facilities. Obviously, the number of admissions since this report dropped to zero for the reporting period described above.

27. In May of 2010, Plaintiff began residing in a transitional housing facility operated by So Others Might Eat ("SOME"), a community-based non-profit organization in the District of Columbia. Plaintiff was then moved to single room housing operated by the same organization. From this point, Plaintiff began filing grievances against the staff of SOME because they, in Plaintiff's words, "ran the facility like a correctional halfway house."

28. Sandra Hill, another resident at the SOME facility, made a complaint of sexual harassment against Plaintiff. On August 10, 2010, Plaintiff was advised by staff members McCall and Mines of the complaints of sexual harassment. After not being provided any information on the complaints that were made against him, on August 10, 2010 Plaintiff filed

another grievance with SOME concerning the handling of these complaints. Plaintiff grieved that he was not provided a fair opportunity to defend himself against the allegations that he denied as untrue. As a result of these false accusations, Plaintiff was placed on restrictions. Sandra Hill was later hired by SOME.

29. On December 22, 2010, Lawrence Parrot, another employee of SOME, made a false allegation against Plaintiff. According to Mr. Parrot, on November 28, 2010, he approached Plaintiff to ask him to stop eating his meal. He described Plaintiff as becoming belligerent, threatening to sue him and that he would "whip his ass." Plaintiff denies this incident. These accusations were nonetheless used to justify his involuntary commitment.

30.  The false accusations continued. Belinda Sealy, Ann Chauvin and Susan Bond, all administrators at SOME, made false statements to William Peters of the District of Columbia Department of Mental Health ("DMH") Mobile Crisis Unit. According to these employees, Plaintiff left threatening notes, hinting at murder and that "you shall die." Plaintiff denies leaving the notes. These notes never were produced or made a part of any record.

31. On January 13, 2011, Plaintiff was accused of "possessing" a razor along with papers as he approached Susan Bond, an administrator at SOME. This was characterized as "insinuating a power trip." Susan Bond further reported that Plaintiff had not been on his medications for months. It was later disclosed by defendant SOME's landlord/tenant attorney, Ed Cordone, that SOME did not preserve a videotape of Plaintiff allegedly pulling a razor blade on anyone. This was confirmed by Belinda Sealy. Later notes indicate that instead of one person, Plaintiff "pulled" a razor on three (3) staff members. Yet again, there is no supportive reports or complaints that raise this statement beyond another inconsistent statement.

32.  Laura Nichols, Clinical Manager at Green Door, Dana Vanzant and Sinead Quinn both employed by Green Door, kept plaintiff from seeing his psychiatrists. Plaintiff alleges that Ms. Nichols canceled his appointments with Dr. Podell on December 7, 2010 and December 20, 2010. Otherwise, Plaintiff would have kept his appointments with his psychiatrist. This refutes any purported claim that Plaintiff was not cooperating with his treatment plan and that the allegation that he was non-cooperative was contrived. This was done in concert with SOME.

33.  At this same time, Protected Health Information ("PHI") was transmitted without Plaintiff's consent. The illegal disclosure is attributed to the conduct of DMH and employees of Green Door. David Walker of DMH was contacted by Margaret Simmons of SOME and was told to contact Green Door for information concerning Plaintiff. And while these communications were admitted to as a part of a January 11, 2011, response to a grievance that was sent from Randy Raybon of DMH, they were supposed to be made a part of his record. There is no indication of the communications or the production of Plaintiff's medical records contained in these records.

Green Door was Plaintiff's health services provider through a contract with DMH. Margaret Simmons was then provided PHI information on Plaintiff that included a complete mental health history, Axis and previous diagnoses by Green Door. This information was in turn used to deprive Plaintiff of his liberty as it was added to the allegations used to justify his arrest and continued detention. These conversations between Green Door and Ann Chauvin of SOME occurred on December 2, 2010, December 13, 2010 and December 15, 2010 that resulted in a "meeting of the minds" and the illegal transfer of protected health information.

34. Timothy Sawina, President of Green Door, was put on notice of these illegal disclosures, but failed to correct, direct or supervise those employees responsible for the illegal

disclosures. Richard Gerlach, Executive Director of SOME, was also aware of his subordinates' efforts to force Plaintiff from Shalom House. On August 18, 2010, Plaintiff filed a grievance with SOME, complaining that false allegations of sexual harassment were raised against him and he was denied any means of defense. On December 22, 2010, Plaintiff further grieved that on December 2, 2010 Margaret Simmons of SOME contacted DMH Access Helpline and was directed to Green Door, Plaintiff's provider, to obtain protected health information. This information was provided and included an initial diagnosis, his living situation and medical history. Thus, John Adams was given notice of these transgressions.

35. On January 13, 2011, three (3) uniformed officers of the Metropolitan Police Department arrived at Plaintiff's apartment and placed Plaintiff under arrest. According to Defendants William Peters and Isha Edwards, this arrest was predicated on his risk of harming himself or others. Defendants Peters and Edwards made, or ordered, this arrest without any personal observation or evidence that Plaintiff was in immediate mental distress. At the time of his arrest there was no indication of any possible risk of harm to Plaintiff or others.

According to the FD 12 prepared by Isha Edwards, Plaintiff's arrest was based on the allegations of SOME staff that he left threatening notes, that Plaintiff was linked to Green Door for mental health services, that Plaintiff was removed from groups at SOME because he was aggressive to staff, Plaintiff was non-compliant with mental health services, lacked insight into his illness, became "decompensated" and was off his medications. Neither Edwards nor Peters made any effort to ascertain his state of mind at the time of his arrest or otherwise question him about the complained of events. This left the FD12 report to rely on multiple levels of hearsay. When the Mobile Crisis Unit arrived at his apartment Plaintiff was taking a shower, preparing to begin his day. This unit only asked Plaintiff if he had ever been to CPEP, a question he refused to

answer. Plaintiff was handcuffed and transported to CPEP. The false allegations raised to support his commitment were made by the employees of SOME with the support of Sarah Hochbaum, an employee of Green Door, as evidenced by the signatures of Ann Chauvin of SOME and Sarah Hochbaum of Green Door.

36. At CPEP, Plaintiff was evaluated by Amelia Villaruz, MD, an employee of the District of Columbia. This evaluation did not include those elements that meet a standard of care that are part of an assessment of a patient. In her individual assessment that was a part of the D.C. Superior Court record, Dr. Villaruz stated that Plaintiff was alert and "fairly cooperative," but spoke with rapid and pressured speech. She described his mood as angry and affect subject to rapid changes. The form next restates element of the FD 12 while embellishing the report by stating that Plaintiff "pulled a razor on staff." Earlier reports never made this statement, only stating that he possessed a razor among other papers. The only statement meeting the standard for involuntary commitment was boilerplate language that is a standard part of the form for the D.C. Superior Court. Other admission notes to CPEP described Plaintiff as being cooperative and directable upon his arrival.

37. Dr. Villaruz's evaluation did not include a clinical interview or testing that would include Cognitive or Wechsler Adult Intelligence Scale IV, memory, personality, Minnesota Multiphasic Inventory 2F or any other evaluative tools. Dr. Villaruz made no mention that Plaintiff ever expressed any suicidal or homicidal ideation beyond the incident that was reported to have occurred two days before the notes were left with staff. In short, there was no indication of an immediate apprehension that Plaintiff posed a threat to himself or others. Instead, according to Dr. Villaruz's report, she relied on the FD 12 and did not make an adequate independent and personal assessment of Plaintiff for an involuntary commitment.  Neither did

Dr. Villaruz articulate any basis or reason to conclude that a less restrictive means other than restrictive commitment through hospitalization would have achieved an articulated treatment plan or addressed a diagnosis or treatment goal. SOME also operated Jordan House, a less restrictive crisis bed facility that would have been a less restrictive alternative environment.

38. On the next day Dr. Villaruz continued her notes to Plaintiff's medical record by describing Plaintiff as continuing to be belligerent and refusing medication, lacking insight into his mental illness, delusional and grandiose. There was no indication of homicidal or suicidal ideation. Because of his refusal of medication and the other described behavior, Dr. Villaruz decided to force medication on Plaintiff.

39. In a nursing assessment that followed his entry into CPEP, Plaintiff was again described as cooperative though with pressured speech, angry mood, labile, or changing, affect, with disorganized thought and delusional. Again, the nursing notes indicate the absence of any suicidal or homicidal ideation.

40. Plaintiff was forcibly medicated at CPEP with Geodon and Ativan, two psychotropic drugs. Plaintiff was standing at the nurses' station speaking with staff when two men came behind him, restrained him, and injected Plaintiff with the medications. These medications made Plaintiff feel drowsy and on the verge of going to sleep. He could not talk or think and felt like a zombie.

41.  Following the forced medication, Plaintiff was ordered held and transferred to Psychiatric Institute of Washington ("PIW"). There is no indication in Dr. Villaruz's written reports that would indicate Plaintiff exhibited symptoms or indications that any serious mental illness presented an imminent risk of harm to Plaintiff or others. In short, Dr. Villaruz ordered further hospitalization when there was no need. The continued hospitalization was not justified

11

within Plaintiff's mental health record or Dr. Villaruz's record of Plaintiff. There is no indication

that a less restrictive alternative was ever considered, such as a less restrictive crisis center or

some form of involuntary outpatient commitment.

On the next day, January 14, 2011, another psychiatrist from DMH CPEP, Dr. Phuong

Thu Vo prepared an application for emergency hospitalization directed to Psychiatric Institute of

Washington. This report restates the previous allegations without noting any present conditions.

The application again reports that Plaintiff was brought to CPEP based on reports of aggressive

behavior and "pulling a razor" on staff. The author again parrots other reports that described the

threatening notes and his failure to maintain his treatment plan with Green Door. Because of

these reports, this psychiatrist concluded that Plaintiff lacked insight into his illness and

possessed poor judgement and considered a danger to himself or others. Therefore, accord Dr.

Phuong requested emergency hospitalization. This determination again lacked any personal

observation or assessment of Plaintiff.

42.    At PIW, further assessments were made of Plaintiff. In this assessment the record

described Plaintiff with a diagnosis of paranoid schizophrenia and that he was hospitalized for

threatening staff at SOME. The record further indicated that Plaintiff had suicidal ideation.

Plaintiff denied ever possessing any suicidal ideation. In another note, the examining physician

again described Plaintiff as well presented though angry and agitated. On the day of his arrival at

PIW, the record indicates that Plaintiff was described as agitated, verbally abusive and

delusional. He was unable to be redirected by staff and did not respond to prompts.  Plaintiff was

forcibly medicated a second time at PIW. On this occasion Plaintiff was again retrained by two

staff members who held in him on floor with a foot on his neck while he was injected with a

syringe.

43. The staff at PIW offered to release him if he agreed to sign a voluntary commitment form and accepted his medication. Plaintiff again refused medication. Fearing further repercussions from his refusal to take the debilitating medication, Plaintiff informed PIW staff that he would cooperate and take the prescribed medication. On January 19, 2011, Silvana Naguib, an attorney with the District of Columbia Public Defender Service, Mental Health Division, went to PIW on behalf of Plaintiff. After informing staff at PIW that she was going to request a 24 hour hearing in the D.C. Superior Court on behalf of Plaintiff, staff took steps to release Plaintiff. Plaintiff was released from PIW on January 19, 2011.

44. On February 1, 2011, SOME filed suit in the D.C. Superior Court Landlord Tenant Division, seeking Plaintiff's eviction from the facility. An initial hearing was scheduled for March 1, 2011. This case was ultimately resolved without Plaintiff's eviction.

45. Plaintiff's lawsuit to obtain information concerning his claims was "heard" in the D.C. Superior Court on July 3, 2014. This was when Plaintiff learned who disclosed his protected health information to Margaret Simmons.

## COUNT I

(42 U.S.C Sect. 1983 Denial of Due Process of Law—Liberty Interest
against the District of Columbia—Failure to Provide or Consider Less Restrictive Alternative)

46. Plaintiff hereby incorporates paragraphs 1 through 45 by reference herein.

47. Plaintiff possesses a protected liberty interest under the Fifth Amendment Substantive Due Process to be free from unjustified detention based on alleged mental illness. Alternatively, D.C. Official Code 21-523, requires DMH to consider a less restrictive alternative to hospitalization. Both theories require that persons subject to detained hospitalization be considered for and afforded a less restrictive alternative to hospitalization.

48. Plaintiff was never considered for a less restrictive alternative to hospitalization after being detained for forty-eight (48) hours by DMH. As a result, Plaintiff was detained at Psychiatric Institute of Washington (PIW), a contractor with DMH.

49. According to practitioners who service the population that is served by DMH, the DMH rarely if ever provided an alternative that was less restrictive to persons suffering a mental health crisis. This observation is buttressed by Meeting notes from the DMH that state that of 73 involuntary admissions as April 2011 none were placed in a less restrictive crisis center.  Even if considered for a less-restrictive alternative, DMH did not provide adequate space for a system that serviced persons suffering a mental health crisis.

50. District law, the Ervin Act, requires DMH to at a minimum consider and place persons in the least restrictive facility that will meet the person's needs.

51. Because of the District of Columbia's failures, Plaintiff was deprived of his liberty in violation of substantive due process of law. Plaintiff suffered emotional distress and other damages that were the direct and proximate result of these constitutional violations. 52. Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees and any other relief the Court deems appropriate.

### COUNT II

(Denial of Due Process of Law-Substantive Due Process Liberty Interest
against Amelia Villaruz—Involuntary Commitment 42 USC Sect. 1983)

53.     Plaintiff hereby incorporates paragraphs 1 through 52 by reference herein.

54.     Plaintiff possesses a protected liberty interest under the Fifth Amendment Substantive -Due Process to be free from unjustified detention based on alleged mental illness.

These protections extend to initial forty-eight (48) hour initial detentions for observation at CPEP, and any subsequent detention beyond the initial observation period.

55.     Amelia Villaruz, an employee of the District of Columbia, extended Plaintiff's detention without making appropriate findings or diagnosis as defined for involuntary commitment in the District of Columbia. Under this standard, involuntary, detained hospitalization can only be based on a finding that person poses a serious and imminent risk of harm to himself or others and that this risk is the result of mental illness. Dr. Villaruz did not make any finding or conduct an adequate examination upon which any reasonable professional could determine that Plaintiff posed a serious and imminent risk of harm.

56.     Dr. Villaruz did not conduct an examination that would have met a prevailing standard for involuntary commitment and thus "shocked the conscience." This violated Plaintiff's right to substantive due process.

57.     As a direct and proximate result of Dr. Villaruz's malfeasance, Plaintiff was detained against his will and forcefully medicated with psycho-tropic drugs.

58.     Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees and any other damages the Court deems appropriate.

## COUNT III

(Denial of Due Process of Law-Forcible Medication, 42 USC Sect. 1983—Amelia Villaruz)

59.     Plaintiff hereby incorporates paragraphs 1 through 58 by reference herein.

60.     Plaintiff is protected from forcible medication in psychiatric facilities by the Fifth Amendment Substantive Due Process of the United States Constitution.

61.     Plaintiff may refuse any medication unless his behavior indicates an immediate risk of harm to himself or others. No such circumstances that would justify the forcible

15

medication of Plaintiff were present in this case. Plaintiff did not present as an imminent risk to himself or others. Despite the lack of justification, Amelia Villaruz, an employee of the District of Columbia acting under color of law ordered the medication of Plaintiff.

62.     Plaintiff was denied his right to due process of law because of the forcible medication at CPEP, a facility operated by the District of Columbia. As a result of the medication, Plaintiff became listless with slurred speech and made to feel like a zombie.

63.     The unlawful forcible medication, done without justification or adherence to any applicable standards "shocked the conscience" and violated Plaintiff's right to substantive due process.

64.     Plaintiff therefore seeks $1million in compensatory and punitive damages, attorney's fees and any other relief the Court deems appropriate.

## COUNT IV

(Illegal Seizure and Detention under the Fourth Amendment and Fifth Amendment against Isha Edwards and William Peters—42 USC Sect. 1983)

65.     Plaintiff hereby incorporates paragraphs 1 through 64 by reference herein.

66.     Any detention of a person based on mental illness must be supported by probable cause this person is suffering from mental illness, and that as a result of this mental illness this person poses a serious and imminent risk of harm to themselves or others. Any risk of harm must be serious and imminent and must be based on reliable evidence.

67.     There is no showing that any initial detention of Plaintiff was based on probable cause. At the time of his arrest, Plaintiff was not experiencing any mental crisis or threatening any harm to himself or others. Any information that Plaintiff posed any harm to anyone was based on impermissible levels of hearsay and was thus unreliable as matter of law.

16

68.     Because of this initial illegal detention, Plaintiff was seized in violation of the Fourth Amendment and Fifth Amendment, held for forty-eight (48) hours against his will and illegally and forcibly medicated.

69.     This caused emotional distress, humiliation, as well as those damages caused by his treatment at the facility.

70.     Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees along with any other relief the Court deems appropriate.

## COUNT V

(Negligent Infliction of Emotional Distress Against
the District of Columbia and David Walker)

71.     Plaintiff hereby incorporates paragraphs 1 through 70 by reference herein.

72.     Under 42 U.S.C. 1320 (d), Plaintiffs personal health information is protected from unauthorized disclosure by health care providers, here DMH and Green Door, LLC.

73.     That DMH and Green Door possessed Plaintiff's protected health information in the form of mental health records and identifying mental health providers.

74.     DMH and Green Door, through its employees Laura Nichols, Sarah Hochbaum and Dana Vanzant did act with Defendant David Walker to disclose this protected health information.

75.     The purpose of the HIPAA statute is to promote public safety and to protect persons in Plaintiff's position and to prevent the type harm caused here.

76.     Because of these disclosures it was foreseeable that the information was to be used for the improper purpose of supporting Plaintiff's wrongful detention.

77.     Plaintiff suffered emotional distress and humiliation as a direct and proximate result of Defendants' negligence.

78.     Plaintiff therefore seeks $1 million in compensatory and punitive damages and any other relief the Court deems appropriate.

## COUNT VI

### (Negligent Infliction of Emotional Distress—The District of Columbia and Amelia Villaruz)

79.     Plaintiff hereby incorporates paragraphs 1 through 78 by reference herein.

80.     Amelia Villaruz, for all relevant time periods, was an employee and agent of the District of Columbia and acting within the scope of her employment.

81.     Amelia Villaruz owed a duty of care to Plaintiff that ensured an adequate examination that would result in a proper and correct diagnosis and treatment.

82.     That Amelia Villaruz violated this standard of care by not conducting an adequate examination of Plaintiff. As a result, Amelia Villaruz first ordered the continued detention of Plaintiff against his will predicated on an unsupported finding that Plaintiff suffered from mental illness and as a result posed an imminent risk of harm to himself or others.

83.     Because of Amelia Villaruz's misdiagnosis, Plaintiff suffered emotional distress and humiliation.

84.     Plaintiff therefore seeks $1 million in compensatory and punitive damages along with any other relief the Court deems appropriate.

## COUNT VII

### (False Arrest—The District of Columbia, William Peters and Isha Edwards)

85.     Plaintiff hereby incorporates paragraphs 1 through 84 by reference herein.

86.     William Peters and Isha Edwards, for all relevant time periods, were employees of the District of Columbia and at the time of Plaintiff's arrest were acting within the scope of their employment. William Peters and Isha Edwards as members of the DMH Mobile Crisis Unit a part of the District or Columbia government charged with the duty to respond to persons in mental crisis and take them into custody.

87.     William Peters and Isha Edwards arrested Plaintiff without probable cause that Plaintiff suffered from a mental illness that at the time of his arrest caused an imminent risk of harm to himself or others. At the time of his arrest, Plaintiff was finishing his shower preparing to start his day. He did not exhibit any signs of mental distress, was not menacing or threatening anyone, did not resist arrest or otherwise indicate an imminent risk of harm due to any mental illness.

88.     The District of Columbia is liable for the actions of its agents. William Peters and Isha Edwards are jointly and severally liable for the illegal arrest and detention of Plaintiff.

89.     Because of Defendants' actions, Plaintiff suffered extreme humiliation and emotional distress.

90.     Plaintiff therefore seeks $1 million in compensatory and punitive damages along with any other relief the Court deems appropriate.

## COUNT VIII

(Intentional Infliction of Emotional Distress—Against Sandra Hill, Ann Chauvin, Belinda Sealy, Susan Bond, John Adams as President of SOME, Richard Gerlach, Executive Director of SOME and SOME and Green Door)

91.     Plaintiff hereby incorporates paragraphs 1 through 90 by reference herein.

92.     Ann Chauvin, Belinda Sealy, Susan Bond, John Adams and Richard Gerlach were all employed So Others Might Eat ("SOME") for all relevant time periods and were acting within the scope of their employment. Sandra Hill was resident of Shalom House, a facility operated by SOME.

93.     All defendants acting within their scope of employment acted to remove Plaintiff from Shalom House, his place of residence for the relevant time period. Defendants falsely obtained protected health information to aid them in obtaining an involuntary commitment of Plaintiff. Defendants falsified and embellished facts and complaints about Plaintiff to aid them in removing Plaintiff from Shalom House, Plaintiff's residence.

94.     The conduct was egregious and the result was the intentional infliction of emotional distress.

95.     Plaintiff therefore seeks $1 million in compensatory and punitive damages along with any other relief the Court deems appropriate. Defendants are jointly and severally liable.

## COUNT IX

### (Violation of D.C. Code 7-1201, et seq)

96.     Plaintiff hereby incorporates paragraphs 1 through 95 by reference herein.

97.     Under D.C. Code 7-1201.02, the disclosure of a person's protected health information is prohibited without authorization by the person or through some limited exception.

98.     Defendants David Walker, the District of Columbia, Green Door, LLC, Sarah Hochbaum, Laura Nichols and Dana Vanzant, all employees of Green Door, disclosed Plaintiff's protected health information. No exception to this disclosure applies. There was no immediate need for the health information. It was not obtained to facilitate the providing of services for Plaintiff.

99.     These disclosures were used to obtain Plaintiff's involuntary commitment by SOME and the District of Columbia.

100.    Plaintiff therefore seeks $1 million in compensatory and punitive damages along with any other relief the Court deems appropriate.

## COUNT X

(Denial of Substantive Due Process of Law, 42 USC Sect. 1983—SOME)101.     Plaintiff hereby incorporates paragraphs 1 through 100 by reference herein.

102.    Defendants SOME was a contractor with DMH, providing mental health services in the District of Columbia to persons serviced by DMH. Employees of SOME, during the course of their duties providing services under the DMH contract, were acting under color of law.

103.    While acting under color law, Defendant SOME and its employees Ann Chauvin, Belinda Sealy and Susan Bond deprived Plaintiff of his right to due process of law by making false statements concerning his conduct, blocking his access to his mental health providers and other acts that resulted in initiating an action to have Plaintiff involuntarily committed and hospitalized. The defendants conduct was egregious that shocked the conscious and resulted in a denial of due process of law.

104.    Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees along with any other relief the Court deems appropriate.

## COUNT XI

(Denial of Substantive Due Process of Law, 42 USC Sect. 1983—Green Door)

105.    Plaintiff hereby incorporates paragraphs 1 through 104 by reference herein.

106.     Defendants Green Door was a contractor with DMH, providing mental health services in the District of Columbia to persons serviced by DMH. Employees of Green Door, during the course of their duties providing services under the DMH contract, were acting under color of law.

107.     While acting under color law, Defendant Green Door and its employees Sarah Hochbaum, -deprived Plaintiff of his right to due process of law by making false statements concerning his conduct, blocking his access to his mental health providers and other acts that resulted in initiating an action to have Plaintiff involuntarily committed and hospitalized. The defendants conduct was egregious that shocked the conscious and resulted in a denial of due process of law.

108.     Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees along with any other relief the Court deems appropriate.

## COUNT XII

(Conspiracy under 42 U.S.C. 1983 against Defendants Ann Chauvin and Green Door, David Walker and D.C. Department of Mental Health and Laura Nichols and Green Door)

109.     Plaintiff hereby incorporates paragraphs 1 through 108 by reference herein.

110.     Defendants Laura Nichols and employees of Green Door and defendant Ann Chauvin and employees of SOME and defendant David Walker and the District Department of Mental Health agreed to violate Plaintiff's rights by illegally disclosing his protected health information, falsely canceled medical appointment for the purpose of involuntarily committing him in violation of the United States Constitution.

111.    That Defendants Ann Chauvin, SOME, Laura Nichols, Green Door were contractors of the District Columbia acting to further the government's interest and were therefore acting under color law.

112.    And that defendants did in fact disclose his protected health information.

113.    And that as a result Plaintiff suffered a violation of his constitutional rights and thereby suffered damages.

114.    Plaintiff therefore seeks $1 million in compensatory and punitive damages. Attorney's fees along with any other relief the Court deems appropriate.

## COUNT XIII

(Medical Malpractice—Amelia Villaruz and District of Columbia)

115.    Plaintiff hereby incorporates paragraphs 1 through 114 by reference herein.

116.    Plaintiff was owed a duty of care by defendant Amelia Villaruz and the District of Columbia to take greater care to review collateral information and make a reasonable assessment before committing Plaintiff to a mental health facility.

117.    Because Villaruz and the District of Columbia relied on misleading information without independent or adequate analysis or diagnosis of Plaintiff, Plaintiff was involuntarily committed for psychiatric care.

118.    As a result, Plaintiff was detained against his will, forcibly medicated and otherwise deprived of his liberty.

119.    Plaintiff therefore seeks damages of $1 million in compensatory and punitive damages and any other relief the Court deems appropriate.

## COUNT XIV

(Denial of Due Process—Violation of Statute—42 U.S.C. 1983 SOME, Green Door and David Walker)

120.    Plaintiff hereby incorporates paragraphs 1 through 119 by reference herein.

121.    Under 42 U.S.C. 1320 (d), Plaintiffs personal health information is protected from unauthorized disclosure by health care providers, here DMH and Green Door, LLC.

122.     That DMH and Green Door possessed Plaintiff's protected health information inthe form of mental health records and identifying mental health providers.

123.     DMH and Green Door, through its employees Laura Nichols, Sarah Hochbaum and Dana Vanzant did act with Defendant David Walker to disclose this protected health information without Plaintiff's authority in violation of the "Privacy Rule" as enacted under 42 U.S.C. Sect. 1320(d)     and under color of law.

124.    The purpose of the HIPAA statute is to promote public safety and to protect persons in Plaintiff's position from the improper disclosure of protected mental health information and to prevent the type harm caused here. The statute creates a right to protected from these unauthorized disclosures.

125.    Because of these disclosures it was foreseeable that the information was to be used for the improper purpose of supporting Plaintiff's wrongful detention.

126.     The disclosure and improper use of this protected health information was egregious and thereby violated Plaintiff's right to due process of law.

127.    Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees along with any other relief the Court deems appropriate.

## COUNT XV

(Medical Malpractice Respondeat Superior—District of Columbia)

24

128.     Plaintiff hereby incorporates paragraphs 1 through 127 by reference herein.

129.     At the time of the complained of events, Defendant Amelia Villaruz, MD was employed by the District of Columbia as psychiatrists of CPEP, a facility operated by the D.C. Department of Mental (Behavioral) Health. Her duties included the assessment of persons entering CPEP and determinations for persons involuntarily entering the District's mental health system. Defendant Amelia Villaruz, MD was thereby an agent of the District of Columbia, acting within the scope of her employment when she made assessments and decisions concerning Plaintiff's mental health status and treatment.

130.     In making assessments and determinations of Plaintiff, Amelia Villaruz, MD did not conduct an examination that met a national standard in ordering that Plaintiff be involuntarily committed or that he should have been forcibly medicated. Defendant Amelia Villaruz, MD relied on unreliable information and did not make an assessment on Plaintiff's mental health condition that would justify Plaintiff's involuntary commitment and forced medication.

131.     The wrongful acts and omissions by Defendant Amelia Villaruz, MD that resulted in Plaintiff's harm was foreseeable to the District of Columbia. And as direct of proximate result of the wrongful acts and omissions by the District of Columbia's agents, Plaintiff suffered harm.

132.     Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees along with any other relief the Court deems appropriate.


**COUNT XVI**

(Medical Malpractice Respondeat Superior-District of Columbia)

133.     Plaintiff hereby incorporates paragraphs 1 through 132 by reference herein.

134.     At the time of the complained of events, Dr. Phuong Vu Tho was employed by the District of Columbia as a psychiatrist of CPEP, a facility operated by the D.C. Department of Mental (Behavioral) Health. Their duties included the assessment of persons entering CPEP and determinations for persons involuntarily entering the District's mental health system. Dr. Phuong Vu Tho was thereby an agent of the District of Columbia, acting within the scope of her employment when she made assessments and decisions concerning Plaintiff's mental health status and treatment.

135.     In making assessments and determinations of Plaintiff, Dr. Phuong Vu Tho did not conduct an examination that met a national standard in ordering that Plaintiff be involuntarily committed to Psychiatric Institute of Washington.  Dr. Phuong Vu Tho relied on unreliable information and did not make an assessment on Plaintiff's mental health condition that would justify Plaintiff's involuntary commitment.

136.     The wrongful acts and omissions by Dr. Phuong Vu Tho that resulted in Plaintiff's harm was foreseeable to the District of Columbia. And as direct of proximate result of the wrongful acts and omissions by the District of Columbia's agent, Plaintiff suffered harm.

137.     Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees along with any other relief the Court deems appropriate.

## COUNT XVII

(Denial of Due Process 42 U.S.C. Sect. 1983 Involuntary Commitment
Dr. Pho Voung Tho)

138.     Plaintiff hereby incorporates paragraphs 1 through 137 by reference herein.

139.      Plaintiff possesses a protected liberty interest under the Fifth Amendment Substantive -Due Process to be free from unjustified detention based on alleged mental illness.

These protections extend to initial forty-eight (48) hour initial detentions for observation at CPEP, and any subsequent detention beyond the initial observation period.

140.    Dr. Pho Voung Tho, an employee of the District of Columbia, extended Plaintiff's detention without making appropriate findings or diagnosis as defined for involuntary commitment in the District of Columbia. Under this standard, involuntary, detained hospitalization can only be based on a finding that person poses a serious and imminent risk of harm to himself or others and that this risk is the result of mental illness. Dr. Tho did not make any finding or conduct an adequate examination upon which any reasonable professional could determine that Plaintiff posed a serious and imminent risk of harm.

141.    Dr. Tho did not conduct an examination that would have met a prevailing standard for involuntary commitment and thus "shocked the conscience." This violated Plaintiff's right to substantive due process.

142.    As a direct and proximate result of Dr. Tho's malfeasance, Plaintiff was detained against his will and forcefully medicated with psycho-tropic drugs.

143.  Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees and any other damages the Court deems appropriate.

**COUNT XVIII**

(Denial of Substantive Due Process of Law, 42 USC Sect. 1983—David Walker)

144.    Plaintiff hereby incorporates paragraphs 1 through 143 by reference herein.

145.    Defendant David Walker was an employee of theh District of Columbia Department of Mental Health (now "Department of behavioral Health") an agency of the District of Columbia, providing mental health services in the District of Columbia to persons serviced by

DMH thereby acting under color of law and charged with the protection of Plaintiff's protected mental health information..

146.    While acting under color law, Defendant David Walker deprived Plaintiff of his right to due process of law by illegally disclosing Plaintiff's protected mental health records and information that resulted in initiating an action to have Plaintiff involuntarily committed and hospitalized. The defendants conduct was egregious that shocked the conscious and resulted in a denial of due process of law.

147.    Plaintiff therefore seeks $1 million in compensatory and punitive damages, attorney's fees along with any other relief the Court deems appropriate.


Pursuant to Fed. R. Civ. P. 10 (c), Plaintiff hereby incorporates all exhibits contained in Dkt. Entry #47 and prior pleadings as a matter of record herein.

Plaintiff hereby demands a trial by jury for claims and issues so triable.


Respectfully submitted,


/s/ _____
GEORGE E. RICKMAN
DC Bar 433298
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
202-258-3643
georgerick11@comcast.net
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

 I do hereby certify that on this 14th day of July 2019, a copy of this Fourth Amended Complaint was served by electronic service on:

AAG Philip Medley
441 Fourth Street, NW 6th Floor South
Washington, DC  20001
philip.medley@dc.gov

Katherine Erklauer
Blumenthal & Cordone, PLLC
7325 Georgia Ave., NW Washington,
D.C.  20012
kerklauer@blumcordlaw.com

Jeffrey Hardie
Jackson Lewis, PC
10701 Pakridge Drive, Suite 300
Reston,        VA              20901
jeffrey.hardie@jacksonlewis.com

/s/
 _____
GEORGE E. RICKMAN
DC Bar 433298
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
202-258-3643
georgerick11@comcast.net
*Counsel for Plaintiff*

29